UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CITY OF NEW YORK,

                       Plaintiff,                       MEMORANDUM
                                                   AND ORDER

     -against-

                                                    98 CV 7227 (ARR)(RML)

NEW YORK CROSS HARBOR RAILROAD
TERMINAL CORP., ROBERT R. CRAWFORD,
and NEW YORK REGIONAL RAIL CORP.,

                       Defendant.
------------------------------------------------------------X

LEVY, United States Magistrate Judge:

          Plaintiff City of New York ("plaintiff" or the "City") moves for partial summary judgment against defendant Robert R. Crawford ("defendant" or "Crawford").[1]  This matter is before me on consent of the parties, pursuant to 28 U.S.C. § 636.  For the reasons set forth below, the motion is denied.

BACKGROUND AND FACTS[2]

          Crawford was the owner and CEO of New York Cross Harbor Railroad Terminal Corporation ("Cross Harbor") from 1989 to 1999.  (Declaration of Daniel Greene, Esq., dated Aug. 22, 2005 ("Greene Decl."), ¶ 2.)  During a voluntary investigation in 1997 and 1998, City consultants discovered contamination at the First Avenue Yard, an approximately 13-acre railroad yard located within the Bush Terminal Complex ("Bush Terminal"), a 200-acre waterfront industrial property in Sunset Park, Brooklyn.  (Greene Decl. ¶¶ 2, 3, 4.)  The City alleges that

---

[1] The other defendants in this case settled with the City in December 2004.

[2] All of the following facts are undisputed for purposes of the current motion unless stated otherwise.

Crawford is responsible for the contamination, in that he knowingly allowed chemical drums, rail ties, and other waste to be buried and/or improperly disposed of at the First Avenue Yard. (Greene Decl. ¶ 2; <u>see also</u> Second Amended Complaint, dated Mar. 18, 2005, ¶¶ 1, 2, 18-21.)

By way of background, Bush Terminal was originally developed in 1895 and was privately owned until the City began purchasing parcels of the property in 1965. (Greene Decl. ¶ 3.) In the years since, the City (originally through the New York City Department of Ports and Terminals ("Ports and Terminals") and now through the New York City Economic Development Corporation ("EDC")), has leased parcels of Bush Terminal to various industrial tenants. (<u>Id.</u>) In 1971, the City purchased the First Avenue Yard for approximately 1.8 million dollars, and beginning on September 1, 1983, the City leased the First Avenue Yard to Cross Harbor for "railroad, floatbridge, and intermodal terminal purposes." (<u>Id.</u> ¶ 5.) Cross Harbor replaced the previous tenant, New York Dock Railway ("New York Dock"), and purchased all of New York Dock's assets at the First Avenue Yard (<u>id.</u> ¶ 4, Ex. C.), which has been used for freight railroad operations since at least 1905. (<u>Id.</u> ¶ 4.) Cross Harbor originally entered into a one-year lease for the First Avenue Yard, which consists of a switching yard for rail cars, eight rail tracks, an administrative building, and a roundhouse used for equipment maintenance. (<u>Id.</u> ¶¶ 4, 5.) Cross Harbor's occupancy permit was extended to a month-to-month tenancy in 1985, and Cross Harbor continues to carry out operations at the First Avenue Yard to this day. (<u>Id.</u> ¶ 5.)

Cross Harbor's original chief corporate officer was Frank Dayton, who had previously worked for New York Dock. (<u>See</u> Ex. C.) However, in January 1989, Crawford, together with other investors, assumed ownership of eighty percent of Cross Harbor's outstanding stock and took control of the company's assets, operations and debt. (Affidavit of Robert R.

Crawford, sworn to Sept. 26, 2005 ("Crawford Aff."), ¶ 7.) On January 27, 1989, Crawford was elected Cross Harbor's Chairman and CEO. (Pl.'s Ex. I.) Frank Dayton stayed on as the company's president until approximately April 1995.[3]

In June 1992, Cross Harbor entered into an agreement with a company called Merco Joint Venture ("Merco"), a shipper of dewatered sewerage waste, to use Cross Harbor's rail yard for its transport operations. (Crawford Aff. ¶ 15; Pl.'s Ex. L.) In preparation for Merco's arrival, Cross Harbor conducted renovations at the site, including asphalt repaving. (Crawford Aff. ¶ 15.) In addition, according to Crawford, "fill was needed to raise the Bush rail yard property level to above the 500 year flood level as directed by the NYS [Department of Environmental Conservation] license specifications requirements." (Crawford Aff. ¶ 44.) Merco began its transport operations shortly thereafter. (Id. ¶ 15.) In 1993, Cross Harbor entered into a contract with a waste oil hauler called Safety Clean. (Deposition of Robert Crawford, dated July 31, 2002 ("Crawford Dep.") at 85, 131-32.)

In approximately 1997, the City hired a company called Valid Construction ("Valid") to remove two underground petroleum storage tanks at the First Avenue Yard. (Affidavit of James Peronto, sworn to Aug. 19, 2005 ("Peronto Aff."), ¶ 6.) During the removal, Valid discovered significant concentrations of chlordane in the soil[4] and was told by persons working in the vicinity that chemical drums were buried in the area. (Id.) Upon discovering the

---

[3] Dayton has since passed away. (Deposition of Robert Crawford, dated July 31, 2002, at 83.)

[4] According to the Second Amended Complaint, chlordane is an insecticide whose use has been banned by the U.S. Environmental Protection Agency. (Second Amended Compl. ¶ 23.)

presence of chlordane and receiving reports of buried drums, Valid performed a preliminary geophysical survey that identified two suspected locations of possible drum burials. (Id. ¶ 7.) Valid then hired a company called Ballard Engineering Consulting ("BEC") to conduct a subsurface soil boring investigation at the site. (Id.) In December 1997, the EDC hired TRC Environmental Corporation ("TRC") to oversee BEC's subsurface investigation, which consisted of drilling twenty soil borings in the First Avenue Yard. (Id. ¶¶ 6, 8.) Based on the results of that investigation, the EDC asked TRC to conduct further investigations at the First Avenue Yard, which TRC did in May, June, and September 1998. (Id. ¶ 9.)

TRC first conducted a geophysical survey, which confirmed the presence of geophysical anomalies, primarily in three large areas. (Id. ¶ 10.) TRC then retained a contractor to excavate test pits at those locations and collect soil samples. (Id. ¶ 11.) At a depth of one foot, the excavations uncovered a large amount of debris, including wood, railroad ties, concrete, crushed drums, and other solid waste. (Id. ¶ 12.) Soil samples taken at a depth of eight feet revealed pesticide contamination and the presence of polynuclear aromatic hydrocarbons ("PAHs").[5] (Id.) Further excavations led to the discovery of 18 crushed drums, several of which had what appeared to be puncture holes, as well as 7 drum lids and 11 drum fragments. (Id.) In addition, TRC found buried wooden rail ties, railroad switching equipment and remnants of a box truck intermixed with waste and other debris. One of the box truck parts bore a New York State Department of Finance State Highway Use Tax ("HUT") sticker bearing the number K19382. (Id. ¶ 15.) Documents obtained from the New York State Department of Taxation and Finance

---

[5] According to James Peronto, a Senior Consulting Engineer with TRC, PAHs are highly carcinogenic and are associated with petroleum contamination. (Peronto Aff. ¶ 17.)

indicate that a box truck bearing that permit number was destroyed in a fire outside the First Avenue Yard on January 23, 1989. (Pl.'s Ex. LL.)

TRC continued its excavation activities, uncovering, among other things, pesticide and PAH-contaminated soil. (Peronto Aff. ¶ 16.) TRC's soil samples indicated the presence of several pesticides, including chlordane, as well as elevated levels of semivolatile organic compounds ("SVOCs"), consisting primarily of PAHs. (Id. ¶ 17.) In sum, TRC's investigation led to the excavation of approximately 1,818 tons of contaminated soil and other debris at the First Avenue Yard. (Id. ¶ 19.)

Crawford stepped down as a director and Chairman of the Board in January 1999. He and his family members continue to maintain their equity holdings in Cross Harbor but no longer participate in the company's administration or management. (Crawford Aff. ¶ 18.)

In the spring of 2001, TRC conducted a follow-up investigation of the First Avenue Yard, which included geophysical surveys, test pit excavations, and soil sampling. (Peronto Aff. ¶ 22.) That investigation uncovered wooden railroad ties, metal debris, and contaminated soils, plus four buried crushed 55-gallon drums. (Id. ¶¶ 24, 25.) Soil sample testing revealed the presence of volatile organic compounds, elevated levels of acetone, elevated levels of SVOCs, consisting primarily of PAHs, and elevated levels of several metals. (Id. ¶ 27.) Low levels of pesticides and PCBs were also detected in soil samples from three test pits. (Id.)

Crawford denies having had any involvement in or knowledge of the burial of hazardous waste at the First Avenue Yard. (Crawford Aff. ¶¶ 3, 19.) He states that, at the time of the alleged incidents, he "was not involved in rail yard operations" (id. ¶ 20), but rather was "the financial man" and, as an engineer, "would be brought into the technical engineering

aspects."  (<u>Id.</u> ¶ 23.)

DISCUSSION

A.  <u>Summary Judgment Standard</u>

The City seeks summary judgment on liability for eight of the causes of action set forth against Crawford in its Second Amended Complaint.  (Memorandum of Law in Support of Plaintiff City of New York's Motion for Partial Summary Judgment on Issues of Liability ("City Mem.") at 2.)  Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried.  <u>Eastman Mach. Co. v. United States</u>, 841 F.2d 469, 473 (2d Cir. 1988).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, there is sufficient evidence favoring the non-movant such that a reasonable jury could return a verdict in that party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 582 (1986).  Likewise, speculative and conclusory allegations are insufficient to defeat a motion for summary judgment.  <u>Allen v. Coughlin</u>, 64 F.3d 77, 80 (2d Cir. 1995).

Moreover, it is well-settled that "[o]n a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but

only to determine whether there are issues to be tried." <u>United States v. Rem</u>, 38 F.3d 634, 644 (2d Cir. 1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."). "'Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.'" Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, Vol. 10A, § 2726 (quoting Advisory Committee Notes to 1963 amendment of Rule 56(e)).

      B.  <u>CERCLA</u>

      The City asserts a claim against Crawford pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, <u>et seq.</u> Congress passed CERCLA on December 11, 1980 "to provide for liability, compensation, cleanup, and emergency response to hazardous substances released into the environment." <u>United States v. Reilly Tar and Chem. Corp.</u>, 546 F. Supp. 1100, 1111 (D. Minn. 1982). Congress's expansive goal in establishing CERCLA's strict liability scheme was to place the financial burdens of hazardous waste cleanups on the responsible parties. <u>Id.</u> (describing one of CERCLA's most important goals as making "those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created"); <u>see also</u> S. Rep. No. 96-848, 96th Cong., 2d Sess. 33 (1980) (CERCLA's strict liability scheme is intended "to assure that the costs of injuries resulting from defective or hazardous substances are borne by the persons who create such risks rather than by the injured partes who are powerless to protect themselves"); <u>Pennsylvania v. Union Gas Co.</u>, 491 U.S. 1, 21 (1989) ("The remedy that Congress felt it needed in CERCLA is sweeping: everyone

who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup") (Brennan, J., plurality opinion), <u>overruled on other grounds</u>, <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44 (1996).

To establish a *prima facie* case of CERCLA liability under § 107(a),[6] a plaintiff must prove that (A) the site in question is a "facility," (B) a release or threatened release of a hazardous substance has occurred, (C) the release or threatened release has caused the plaintiff to incur certain response costs, and (D) the defendant in question is a responsible person. 42 U.S.C. § 9601 (1994). In keeping with CERCLA's broad remedial purpose, there are four categories of

---

[6]     CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), provides two legal avenues by which a party can recoup some or all of the costs associated with an environmental cleanup: a "cost recovery" action under § 107(a), and a contribution action under § 113(f). Section 107(a), by its terms, permits recovery of "any. . . necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Section 113(f)(1), by contrast, states that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [§ 107(a)] for response costs." 42 U.S.C. § 9613(f)(1). Under § 113(f)(1), "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." <u>Id.</u>  In <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, __ U.S. __, 125 S. Ct. 577, 160 L.Ed.2d 548 (2004), the Supreme Court held that a party cannot obtain a judgment for contribution under § 113(f) unless it has been sued by another party under § 106 or § 107(a). Since the City has not been sued under CERCLA, but instead has conducted a voluntary investigation and cleanup effort, it is not eligible to bring a contribution claim against Crawford under § 113(f).

In light of the apparently conflicting holdings of <u>Bedford Affiliates</u>, 156 F.3d 416, 425 (2d Cir. 1998), and <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, --- U.S. ----, 125 S. Ct. 577, the parties briefed the issue of whether the City, as a PRP that has not been sued, is eligible to bring suit against another PRP under § 107(a). However, during the course of briefing, the Second Circuit issued a decision in <u>Consolidated Edison Co. of NY v. UGI Utilities, Inc.</u>, 423 F.3d 90 (2d Cir. 2005) ("<u>Con Ed</u>"), which resolved the issue. According to <u>Con Ed</u>, "section 107(a) permits a party that has not been sued or made to participate in an administrative proceeding, but that, if sued, would be held liable under section 107(a), to recover necessary response costs incurred voluntarily. . . ." <u>Id.</u> at 100. Consequently, the City may pursue a cost recovery action against Crawford under § 107(a).

potentially responsible persons ("PRPs")[7]: (1) the current owners and operators of a vessel or of a

facility, (2) any person who at the time of disposal of any hazardous substance owned or operated

any facility at which such hazardous substances were disposed of, (3) any person who by

contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a

transporter for transport for disposal or treatment, of hazardous substances owned or possessed by

such person, by any other party or entity, at any facility or incineration vessel owned or operated

by another party or entity and containing such hazardous substances, and (4) any person who

accepts or accepted any hazardous substances for transport to disposal or treatment facilities,

incineration vessels or sites selected by such person, from which there is a release, or a threatened

release which causes the incurrence of response costs, of a hazardous substance.  42 U.S.C. §

9607(a) (1994).   PRPs are held strictly liable for necessary cleanup costs "incurred by any other

person consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).

       The City's CERCLA claim against Crawford is predicated on a theory of past

operator liability.  The Supreme Court has defined "operator" as follows:

> [A]n operator is simply one who directs the workings of, manages,
> or conducts the affairs of a facility.   To sharpen the definition for
> purposes of CERCLA's concern with environmental contamination,
> *an operator must manage, direct, or conduct operations specifically*
> *related to pollution, that is, operations having to do with the*

---

[7]  The Second Circuit generally eschews the terms "potentially responsible person" and "PRP" as "vague and imprecise."  <u>Con Ed</u>, 423 F.3d at 98 n.8.  Because those terms appear throughout the parties' briefs and in most of the cases discussed therein, this court will use them for purposes of the instant motion.

Moreover, we believe the term may be read to confer on a party that has not been held liable a legal status that it should not bear. We believe our alternative designation--a party that, if sued, would be held liable under section 107(a)--is more precise.

*leakage or disposal of hazardous waste, or decisions about
compliance with environmental regulations.*

 United States v. Bestfoods, 524 U.S. 51, 66-67 (1998) (emphasis added).  The Court in Bestfoods

further explained that, "when [Congress] used the verb 'to operate,' . . . the statute obviously

meant something more than mere mechanical activation of pumps and valves, and must be read to

contemplate 'operation' as including the exercise of direction over the facility's activities."

Bestfoods, 524 U.S. at 71.

   Although the Supreme Court's decision in Bestfoods established the general

standard for holding a party directly liable as an operator under CERCLA, the determination of

which factual scenarios will justify such liability has been left to the lower courts.  In remanding

to the Sixth Circuit, with instructions to return the case to the district court for further

proceedings, the Court declined to set forth specific guidelines for exactly how much control a

party must exhibit before liability will be imposed, and which factors should be considered.  See,

e.g., United States v. Township of Brighton, 153 F.3d 307, 312-15 (6th Cir. 1998) (three judges

disagreeing on the requisite level of control required, citing Bestfoods' lack of factors to

consider).  One thing, however, is clear: before one can be considered an "operator" for CERCLA

purposes, "one must perform affirmative acts."  Township of Brighton, 153 F.3d at 314.  The

failure to act, even when coupled with the ability or authority to do so, cannot make a person or

entity into an operator.  Id.  After operator liability is established, however, a party is equally

liable for omissions as for affirmative acts.  See id. at 315.  Moreover, "the imposition of

operator liability does not require a finding that the [defendant] directly participated in the day-to-

day activities at the hazardous waste facility."  United States v. Kayser-Roth Corp., 103 F. Supp.

2d 74, 82 (D.R.I. 2000), aff'd, 272 F.3d 89 (1st Cir. 2001).  Rather, Bestfoods recognizes that

operator liability may be imposed when one generally controls the management of operations having to do with the leakage or disposal of hazardous wastes or decisions about compliance with environmental regulations. Id.

Crawford does not challenge the First Avenue Yard's status as a "facility" within the meaning of § 107(a) or deny that the City has incurred response costs as a result of a release of hazardous substances at the site.[8] The parties' dispute centers on whether there is sufficient evidence to demonstrate that Crawford was an "operator" of the First Avenue site at the time hazardous substances were released there. Crawford denies having had any knowledge of contamination at the First Avenue Yard. (See Crawford Dep. at 159-61.) He avers that he was involved with Cross Harbor's financing and business prospects, but was unfamiliar with the actual operation and management of the railroad. (Crawford Aff. ¶ 9; Crawford Dep. at 85.) He states that he relied on others, including Frank Dayton, to operate the railroad and performed none of its day-to-day functions. (Crawford Aff. ¶ 20.)

The City alleges that Cross Harbor engaged in a number of instances of illegal dumping at the First Avenue Yard, during which Crawford was an operator of the site. The City's evidence consists primarily of Cross Harbor documents and the deposition testimony of three individuals: Raymond Aufiero, Cross Harbor's maintenance foreperson from 1987 through 1996; Dominick Massa, whose company, Harborside Management, leased warehouses next to the

---

[8] Crawford does challenge the City's characterization of the level of contamination and question the necessity for the amount of soil excavation it conducted. (See Def.'s Mem. of Law at 12-15; Crawford Aff. ¶¶ 48-59.) For purposes of deciding the instant motion it is unnecessary for the court to address that dispute. See Prisco v. A & D Carting Corp., 168 F.3d 593, 602 (2d Cir. 1999) ("In determining liability under § 107, the quantity or concentration of the hazardous substance is not a factor.").

First Avenue Yard and managed utilities at the First Avenue Yard; and Graviel Baez, a welder employed by Cross Harbor from 1993 through 1997.

Raymond Aufiero

Aufiero testified that when he first arrived at Cross Harbor in 1987, prior to Crawford's involvement in the company, there were two drums containing creosol, as well as "probably" fifty other barrels, stored at the site. (Deposition of Raymond Aufiero, dated Feb. 27, 2003 and May 14, 2003 ("Aufiero Dep."), City of New York Ex. G., at 56-57.) He also recalled seeing the word "chlordane" on one or two drums at the site. (Id. at 112.) Aufiero did not know what, if anything, the remaining barrels contained, but he did recall that all of the drums were removed from the property at some point, and that the removal took place over the course of a week. (Id. at 58.) Aufiero could not recall exactly when the removal occurred, but he stated that "the barrels were disappearing just around the time [Cross Harbor was] bringing in a new customer, Merco [ ], and everything was getting cleaned up, before they got there." (Id. at 59.) He said, "They were talking about this customer coming in and they wanted to have the yard that was just adjacent to the offices and they wanted to get it all cleaned up and, you know, that's what they did. They got it all cleaned up." (Id.) He stated that he had no direct knowledge of any drums being buried at the First Avenue Yard. (Id. at 113.)

Much of Aufiero's testimony concerned the activities of Crawford's son, Bruce Crawford, who worked at the First Avenue Yard.[9] According to Aufiero, Bruce Crawford was

_____

[9] Bruce Crawford, whose full name is Robert Bruce Crawford, apparently held a number of positions at Cross Harbor, including Operations Coordinator and Terminal Manager. (See Pl.'s Ex. T; see also Affidavit of Robert Bruce Crawford, sworn to Sept. 26, 2005, ¶ 2.) He also served as the Secretary of the Board of Directors from approximately August 1991 to July 1994.

(continued...)

heavily involved in all of Cross Harbor's operations, from sales to the "day-to-day operations . . . in the shop."  (<u>Id.</u> at 41.)  Aufiero said that, by 1997, Bruce Crawford "knew how to do everything, run a train, everything" (<u>id.</u> at 224) and "would do physical work or clerical work, whatever was needed at the time."  (<u>Id.</u> at 244.)

Among the equipment Cross Harbor owned was a large yellow pettibone speed swing, referred to by Cross Harbor's employees as "Bertha."  (<u>Id.</u> at 44.)  Aufiero testified that a speed swing is "an articulated bulldozer" with an hydraulic arm, a plow shovel, and the capacity for all four wheels to turn.  (<u>Id.</u> at 46.)  According to Aufiero, Bruce Crawford knew how to operate the pettibone, and did so often in the course of the company's operations.  (<u>Id.</u> at 50-51.)  In fact, Aufiero testified that he twice witnessed Bruce Crawford using "Bertha" to bury rail ties.  On one occasion, Aufiero was standing outside, near the office, when he allegedly saw Bruce Crawford using the yellow pettibone to bury "maybe" ten ties in a large hole.  (<u>Id.</u> at 67-69, 71.)  He could not recall when this happened, but he remembered that "the Crawfords were in charge at the time."  (<u>Id.</u> at 67.)  Aufiero testified that he never told anyone about this, but "just assumed Bruce was cleaning up, and I just went about my business."  (<u>Id.</u> at 69.)  On the second occasion, Aufiero allegedly watched as Bruce Crawford "pushed two or three timbers" into a hole at the foot of a bridge.  (<u>Id.</u> at 71-72.)

With respect to rail ties, Aufiero explained that, typically, whenever tracks were replaced, the old rail ties would be reused, "carted out," or left next to the new tracks until "there was extra money" to pay for removal.  (<u>Id.</u> at 73.)  However, "after the Crawford[]s came in," the

_____

[9](...continued)
(<u>See</u> Pl.'s Exs. N, T.)

old rail ties "were just starting to disappear." (Id.) Aufiero testified that he did not know "[w]here they were going," (id.) but conceded the possibility that they were removed by a waste carting company without his knowledge. (Id. at 221.)

Aufiero also testified about an event in which someone was hired or otherwise engaged to dig a trench "about fifty feet" from the main offices on the Cross Harbor property "just prior to" the arrival of Merco. (Id. at 97-98, 293.) Aufiero could not recall how long the trench stayed open, but he stated that it was there "for a long time" – "it could have been two months, three months. I am not sure" – and it was "big." (Id. at 98, 100.) He said, "I remember one day when they were digging it I was watching the bulldozer go down, and when he was in the bottom of the ditch you couldn't see the top of the bulldozer anymore." (Id. at 98.) He estimated that it was "more than 12 feet wide, maybe 15 feet wide [and] [i]t could have been 100 feet long." (Id. at 292.) Aufiero testified that he did not know the name of the contractor who dug the trench, but that "Bob [Crawford] would know who he is" because "Bob ran the railroad. He knew everything they were doing." (Id. at 101.) He was certain, however, that Cross Harbor employees did not dig the trench, and that Cross Harbor "wouldn't have the equipment to dig a trench like that." (Id.)[10]

Later, Aufiero testified, the trench was filled in and Merco covered the area with asphalt. (Id. at 133, 170.) When asked what was used to fill in the trench, Aufiero said "I seen [railroad] ties, dirt, few smashed drums, black drums, metal debris that I wouldn't recognize and a

---

[10] Earlier in the deposition, Aufiero testified that "Bertha" was capable of digging large trenches, although a backhoe would take considerably less time, and that if "Bertha" were used to dig a trench 100 feet long, 15 feet deep, and 12 feet wide right in front of the Cross Harbor office, it would take "days, two days, three days, . . . a long time" and would be visible to anyone working in the office. (Aufiero Dep. at 54-55.)

lot of dirt" plus "some tracks, some track plates, metal pieces of whatever." (Id. at 293-94.)

However, Aufiero could not say who filled the trench. Although he saw Bruce Crawford "out there every once in a while" driving the pettibone, Aufiero testified, "I never seen [sic] him put anything in that particular hole." (Id. at 295-96.)

When asked if the drums he described earlier "ended up in that trench," Aufiero said "I don't have any personal knowledge of it being in there. I never went and looked." (Id. at 101-02.) Later in the deposition, Aufiero expressly denied that any Cross Harbor employee was involved in burying drums of chemicals in the trench. When asked whether Crawford had instructed employees to bury drums, he said, "No employee, never. It would have had to go through me, and I would have never, ever done that. Even if he went through an employee without my knowledge, the guy would have come to me." (Id. at 118.) When asked if Frank Dayton ever ordered the burial of chemical drums, Aufiero replied "Never. . . .Because I worked for Frank Dayton for a lot of years and got to know him over the years. He just wouldn't do that." (Id. at 120.) When asked if he ever saw Crawford near the trench, he testified, "I've seen Bob out there from time to time. I mean, I don't know who he was with, you know." (Id. at 102.) He also said "I seen him [sic] walk in the yard, talking to Bruce in the vicinity of the trench but I can't recall him ever just going to the edge of it and looking down." (Id. at 297.) Otherwise, Aufiero refused to speculate about Crawford's knowledge or involvement with respect to the trench. He said, "I didn't see Bob Crawford put one thing in there and didn't hear him say anything should go in there." (Id. at 120.) He further testified that if drums containing hazardous materials were buried at the site, "[i]t wouldn't have been one of my workers, that's for sure." (Id. at 121.)

With respect to rail ties having been buried in the trench, Aufiero testified that he could not say how many such ties were buried (id. at 304), but he did say that, at the time the trench was created, there were approximately 500 ties stacked in the yard. (Id. at 313.) He further stated, after the trench was paved over, the ties were no longer there. (Id. at 325.)

Although Aufiero stated that he never saw any Cross Harbor employee bury drums or puncture drums, he said he did once witness Crawford's son, Bruce Crawford, using "Bertha" to flatten three empty, green and white 30-gallon drums. (Id. at 130-31.) Aufiero testified that he did not know what the drums had contained, how those drums came to be in the First Avenue Yard, or whether the drums were removed from the property. (Id. at 132.) However, at another point in the deposition, Aufiero testified about an incident in which he saw Bruce Crawford operating the pettibone to crush a metal drum, after which he noticed that the ground was wet and was emitting a "foul odor," which he could not identify. (Id. at 275-76.)

Aufiero also described one occasion on which he saw drums being delivered to Cross Harbor "right around 4:00 p.m." (Id. at 166.). He testified:

> It was around quitting time because the guys were washing up. I
> was asked by someone to open up the doors in the middle bay, . . . I
> honestly don't remember who it was. A truck pulled in, I shut the
> doors behind the truck, the guys were washing up and one of my
> men opened the door of the truck, he wanted to see what was in it.
> There was white and green drums, there was plastic over them and
> it had the symbol for contaminated material. I closed the door of
> the truck, told the guys to go home and I went about my business.

(Id. at 165-66.) Aufiero could not recall what year this took place, but stated that he believed it was during his last year at Cross Harbor, which was approximately 1996 or 1997. (Id. at 167.) He said he did not know how many drums were in the truck, what the drums contained, or whether the drums were disposed of at the First Avenue Yard. (Id. at 167-68.) He did say that

the drums were probably not stored on the premises because "they were like bright green and white and would have stood out if they were stored. There weren't too many places to hide them that I would have gone, that I wouldn't have run into them." (Id. at 169.) Aufiero testified that he did not discuss the delivery with Crawford, but he did overhear Crawford discussing it with someone else. (Id. at 257.) Aufiero said that the next morning some of his subordinates were complaining that the pettibone had a "foul odor" or a "chemical smell," and he instructed them to hose it down. (Id. at 268, 271.) Aufiero could not say whether there was any connection between the delivery of the drums and the odor emanating from the pettibone. (Id. at 272-73.)

With respect to Crawford's general method of conducting business, Aufiero testified that Crawford never gave orders directly to anyone in the yard, but instead would convey his wishes through others in the chain of command. He said, "[Crawford] was pretty good like that, even though he was the guy in charge. He never interfered." (Id. at 126.) However, Aufiero also testified that Crawford had differences with Frank Dayton and that, over time, Crawford and his wife and son assumed greater responsibility and control over the company. (Id. at 242-43.) Aufiero said that after Dayton retired in April 1995, "Bob Crawford was around just about every day." (Id. at 244.) He continued, "you couldn't do anything without [Crawford] knowing it and if he didn't want it done, it wouldn't be done. He was the boss. He owned it." (Id. at 246.) Later in the deposition, Aufiero stated that it would have been "impossible" for the trench he described to have been filled without Crawford's approval. (Id. at 307.)

Aufiero explained that he left Cross Harbor in approximately 1997 because the company was experiencing financial difficulties and receiving threats. (Id. at 115, 224.) He described one incident in which a man appeared at Crawford's office with a gun, in an apparent

effort to collect on a debt:

> Without getting crazy here, I think there was a time Crawford must
> have owed out a lot of money and there was always something
> going on in that office. People were always coming after
> [Crawford], and I didn't want any part of that. There was a time a
> guy was threatening to [shoot] him. I went upstairs to get Bruce.
> Bruce ran away. He went home. That's why I distanced myself,
> and it was getting worse and worse and that's why I resigned . . . .

(Id. at 115)

Crawford disputes Aufiero's testimony, describing him as a "disgruntled employee" who quit his employment abruptly "and went to work for a competing business . . . without notice to anyone at [Cross Harbor]." (Crawford Aff. ¶ 30.) Crawford denies that his son ever operated the pettibone (id. ¶ 31), and he asserts that Aufiero reported to Frank Dayton exclusively until Dayton's retirement in April 1995. (Id. ¶ 32.) He describes all of Aufiero's testimony as a "fabrication." (Id. ¶ 41.) Bruce Crawford likewise denies Aufiero's allegations and states that he "never, ever operated the Pettibone" and "never, ever buried waste or rail ties or anything at the First Avenue Yard." (Affidavit of Robert Bruce Crawford, sworn to Sept. 26, 2005, ¶ 5).

Dominick Massa

Dominick Massa testified that he is the owner of Harborside Management Corporation ("Harborside"), which leases approximately ten square blocks of industrial space at One 43rd St. in Brooklyn, New York. (Deposition of Dominick Massa, dated July 25, 2001 ("Massa Dep."), at 7.) Massa stated that he has owned Harborside since 1989, and he described its location as "right up the street" from Cross Harbor. (Id. at 7-8.) Massa said that he has had a number of business dealings with Cross Harbor, including supplying Cross Harbor with electrical

current and water and subleasing office space to Cross Harbor.  (Id. at 10-11.)  He also said that the two companies share rights of way.  (Id.)

Massa testified that, in the late 1980's and early 1990's, he spoke with Crawford "almost every[] day" about matters such as "[d]ay-to-day problems, operations, [and] security issues."  (Id. at 12.)  He described Crawford as "number one" at Cross Harbor, and said Crawford was "the one that told everybody what to do. . . ."  (Id. at 16.)  Massa further stated that on the frequent occasions when he wanted to borrow equipment from Cross Harbor – such as a pump, a welding machine, wrenches, steel bars, or railroad ties – he would go directly to Crawford.  (Id. at 17.)

Massa testified that he often entered Cross Harbor's storage garage, where he saw, among other things, "drums of chemicals."  (Id. at 19.)  He could not recall precisely how many drums there were, but he said there were "roughly speaking maybe 25, 50.  They were lined all the way up around the sides in the back of the garage."  (Id. at 20.)  He said the drums remained in the storage garage "[p]robably from '89 to '92, '93," but that the drums were removed in approximately the summer of 1992.  (Id. at 20-21.)  When asked where the drums went, he said, "They were in a hole in the front of the office."  (Id. at 21.)  Massa said he knew this because he once witnessed Crawford "standing over the hole . . . looking into the hole," and he saw drums inside the hole.  (Id. at 22.)  He said that the hole was approximately 10 to 12 feet wide and 100 feet long, and there were approximately 50 drums in it.  (Id. at 22, 31.)  Massa could not recall precisely when this occurred, but he stated that it was around the time Cross Harbor was cleaning up the yard in anticipation of Merco's arrival.  (Id. at 22-23.)  He described the scene as follows:

> You know, you got to picture this.  He's [Crawford] standing at the
> hole.  I'm walking behind him.  I see the tops of the drums in the

> hole and I looked and I just did an about face and walked away. I
> was sick. I went back to my office and believe it or not, from that
> day until somebody else was on the property digging for and testing
> the property for buried oil tanks this thing was on my mind every
> day and night and that was years.

(Id. at 24.)  Massa stated that the hole was eventually covered with macadam and tar.  (Id. at 28.)

He said that he never spoke with Crawford about what he saw (id. at 29), and he conceded that he

did not know who directed the digging of the trench or the burial of the drums. (Id. at 87, 94.)

Massa testified that, when the City contractors arrived to remove underground

petroleum storage tanks, he directed them as to where to find buried drums in the First Avenue

Yard.  (Id. at 32-40.)  He said he watched as the contractors removed drums and other debris from

the area where, years earlier, he had seen Crawford looking into the trench.  (Id. at 40-42.)

Massa passed away on July 6, 2005, and Crawford denies all of his allegations.

(See Crawford Aff. ¶ 37.)  Crawford describes Massa as a "business rival" of Cross Harbor who

"had loaned money to [Cross Harbor] in the past, and was upset that the funds had not been paid

back."  (Id. ¶ 21.)  Crawford also asserts that Massa and Aufiero were partners in several business

ventures, including a warehouse business on the Bush Terminal property.  (Id. ¶¶ 27, 32.)

Graviel Baez

Baez, who worked as a welder for Cross Harbor from 1993 through 1997,

described an incident in which a truck carrying green and white drums arrived at the First Avenue

Yard at approximately 4:30 p.m., as Baez was about to leave work for the day.  (Deposition of

Graviel Baez, dated Feb. 24, 2003 ("Baez Dep."), at 24-25.)  He said that, at the time the truck

arrived, Crawford's car was parked at the site, as was Bruce Crawford's vehicle.  (Id. at 28-29.)

Baez testified that he saw the truck pull up near the office, and then he left the premises for the

night.  (Id. at 29.)   He said that, when he arrived the next morning and entered the roundhouse, he smelled a strong odor coming from the payloader and saw that "the whole front of it was full of this shiny liquid substance."  (Id. at 31-32.)  Baez recalled that Aufiero instructed him to wash down "Big Bertha," and that he had to clean it with a steam cleaner three times to remove the "greasy oily substance" from the bucket and front tires.  (Id. at 32, 102, 111-12.)  Baez could not recall precisely when this occurred, but he stated that it was in approximately 1997.  (Id. at 33.)

Baez said that he saw the same truck at the First Avenue Yard around four or five times after that first incident, but that the truck door was closed and he could not say what, if anything, was in the truck on those occasions.  (Id. at 41-42.)  He also said that the truck always arrived at or after 4:30 p.m., but that he never saw the truck's driver speaking with anyone[11] and he never saw anyone unload anything from the truck.  (Id. at 46, 99.)  Baez did not know who arranged for the truck to enter the First Avenue Yard.  (Id. at 107.)

Baez testified that he was asked to wash the pettibone on two subsequent occasions, and that he did so in the roundhouse, allowing the waste to drain onto the floor.  (Id. at 114-18.)  He described the odor as "nasty" and the color of the liquid as "clear."  (Id. at 117.)  He said he smelled the same odor in the yard occasionally in the summer.  (Id. at 119.)  However, Baez could not say whether the pettibone was used to bury material in the yard.  He testified:

> I can't say something I did not see.  You understand? . . . . I know
> what I've done, that was to clean the pettibone.  What I smelled in
> the yard, now whether both of them are together, I can't say
> because I never witnessed it.  You understand?  You have to be a
> witness in order for you to say yes.

---

[11] Later in the deposition Baez testified that he did see the driver speaking with Peter Velazquez, who was in charge of security, but "whether he had anything to do with it, your guess is as good as mine, you know."  (Id. at 108, 116.)

(<u>Id.</u> at 122.)  Baez did not have any knowledge concerning the digging of a trench or the burial of drums.  (<u>Id.</u> at 34-36.)

Crawford contends that Baez was a "disgruntled employee because he was fired (for cause twice) and failed to be re-instated despite his appeals to the union."  (Crawford Aff. ¶ 33.)  He also claims that Baez "fraternized with Aufiero" and had substance abuse problems.  (<u>Id.</u>)

<u>The Documents</u>

The City also points to a number of documents that allegedly demonstrate Crawford's status as an operator of the First Avenue Yard for CERCLA purposes.  For example, in May 1992, at around the time Cross Harbor entered into its contract with Merco, Cross Harbor and Merco jointly submitted an application to the New York City Department of Environmental Protection ("DEC") for a Solid Waste Management Facility Permit.  (Pl.'s Ex. U.)  Crawford's was the only signature on the application.  (<u>Id.</u>)  When the DEC issued the permit in June 1992, the permit identified Crawford as the "Contact Person for Permitted Work." (Pl.'s Ex. V.)  A Solid Waste Management Facility Inspection Report, dated March 8, 1994, contains Crawford's signature as the "Individual in Responsible Charge."  (Pl.'s Ex. W.)

In addition, in June 1992, Crawford signed an agreement allowing Merco to make improvements at the First Avenue Yard, including fencing, gates, placing stone, paving, and new roadways.  (<u>See</u> Pl.'s Ex. L.)   In August 1994, Crawford wrote a letter inviting Clay Lifflander, president of the EDC, to tour the First Avenue Yard and discuss Cross Harbor's "strategic plans for the near and long-term future."  (Pl.'s Ex. O.)  In September 1994, Crawford wrote to the New York State Department of Environmental Conservation ("DEC") to memorialize a meeting in which Cross Harbor agreed to make certain improvements to the First Avenue Yard, including adding fencing and paving.  (Pl.'s Ex. P.)  In November 1994, Crawford wrote to the EDC with specific plans for paving the First Avenue Yard.  (Pl.'s Ex. R.)  Given the timing of these letters, it appears Crawford was facilitating many of these improvements for the purpose of making the First Avenue Yard suitable for use by Merco and Safety Clean.

These documents demonstrate Crawford's direct involvement in at least some

environmental compliance issues for Cross Harbor.  Indeed, Crawford testified in his deposition that from 1992 to 1994 he personally met with DEC engineers a number of times to discuss the emission of noxious odors from sludge containers being stored at the First Avenue Yard and oil spills occurring in connection with Safety Clean's operations.  (See Crawford Dep. at 117-19.) Crawford also submitted proposals to DEC in an attempt to resolve complaints from the community about odors emanating from sludge containers at the First Avenue Yard.  (See id. at 119-27, Pl.'s Exs. P, S.)  He testified that he viewed it as his responsibility, as an officer of the company, "to make sure that all the elements that are necessary to solve the problem are being put in place. . . ."  (Crawford Dep. at 126-27.)  He also stated in his affidavit that he engaged in correspondence with the DEC and EDC because he "had a more rudimentary understanding of the environmental issues than Dayton."  (Crawford Aff. ¶ 24.)  However, Crawford also testified that he viewed the odor control problem as "Merco's problem to solve," and stated that Cross Harbor's primary duty in that regard was to "make them [Merco] aware of that odor control situation and . . . they had procedures to minimize or eliminate that odor control problem."  (Id. at 121-22.)

Application of the <em>Bestfoods</em> Test

In order to find Crawford personally liable under CERCLA, the court would have to find sufficient facts to establish *both* that (a) Crawford was an operator of the First Avenue Yard, and (b) a release of a hazardous substance occurred at the First Avenue Yard during Crawford's tenure as an operator.  On the issue of whether Crawford was an operator, it is clear that Crawford's titles and stock ownership in Cross Harbor, while perhaps providing him with the authority to control "operations specifically related to pollution," do not alone support a finding

-24-

of actual control.  See Bestfoods, 524 U.S. at 67 (rejecting authority to control as a basis for operator liability).  Instead, an operator must be actively involved in decisions regarding disposal of hazardous substances or environmental compliance.  Id.  Moreover, "courts applying the actual control test have consistently required more than casual or occasional involvement in such decisions."  City of Wichita, Kansas v. Trustees of the APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1055 (D. Kan. 2003).  Thus, although "the imposition of operator liability does not require a finding that the [defendant] directly participated in the day-to-day activities" at the site (Kayser-Roth Corp., 103 F. Supp. 2d at 82), an operator under CERCLA "must *make the relevant decisions* on a frequent, typically day-to-day basis."  City of Wichita, 306 F. Supp. 2d at 1055 (citing cases) (emphasis added).

In City of Wichita, on which the City relies, the court held that a company president, who was "two layers removed from the day-to-day supervision of operations," was nonetheless an operator for CERCLA purposes because he participated in weekly meetings at which environmental compliance issues were addressed and "no decisions were made at those meetings without [the defendant's] approval."  Id. at 1055-56.  Based on "the frequency of those meetings," and the fact that the defendant was "actively involved in deciding matters of environmental compliance," the court found him to be an operator.  Id. at 1056.  On the other hand, the president and majority stockholder of another company, who merely established handling procedures for chlorinated solvents and gave the local manager general admonitions about safe-handling procedures, was held not to be an operator because he did not make the "type of decisions that would impose liability for directing environmental compliance matters."  Id.

Indeed, in every case cited by the City concerning operator liability, the individual

found to be an operator was actively involved in decision-making concerning environmental compliance or hazardous waste disposal on a regular, ongoing basis. <u>See</u> <u>United States v. Jones</u>, 267 F. Supp. 2d 1349, 1355-56 (M.D. Ga. 2003) (defendant "made all of the important decisions involving the facility," was "the primary decision maker over the facility's compliance with environmental regulations," and was "directly involved in the hiring of environmental consultants and communicated with them regularly about the facility's environmental compliance."). <u>See also</u> <u>Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat</u>, 195 F.3d 953, 956 (7th Cir. 1999) (remanding for a determination of director's status and explaining that the defendant could be liable if he "supervised the day-to-day operations of the landfill – for example, negotiating waste-dumping contracts with the owners of the wastes or directing where the wastes were to be dumped or designing or directing measures for preventing toxic substances in the wastes from leeching into the ground and thence into the groundwater.")[12]; <u>United States v. JG-24, Inc.</u>, 331 F. Supp. 2d 14, 63 (D.P.R. 2004) (owner of fiberglass product manufacturing company was an operator because the defendant company was a proprietorship, not a corporation, and individual defendant controlled all aspects of the business). By contrast, courts have held that an individual officer or director who has only limited or sporadic involvement in environmental compliance issues or hazardous waste disposal cannot be considered an operator for CERCLA purposes. <u>See</u>,

---

[12] On remand, the district court determined that the officer in question was an operator because, among other activities, he personally handled the special waste disposal process: he personally saw or inspected (or tried to inspect) every waste stream that was permitted as special waste and took waste samples from each special waste generator himself, arranged for the testing with the laboratories to analyze each special waste sample, applied for each special waste permit, signed each special waste application as the owner and operator of the site, and negotiated with the state agency over the special waste approval process. <u>Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat</u>, No. 92 C 20259, 2000 WL 1716330, at *2 (N.D. Ill. Nov. 8, 2000).

e.g., Riverside Market Dev. Corp. v. International Bldg. Prods., Inc., 931 F.2d 327, 329 (5th Cir.

1991) (pre-Bestfoods case upholding grant of summary judgment in favor of defendant who

visited the plant two to four times a year and whose primary responsibilities were reviewing

financial statements and attending meetings of the officers); Aero-Motive Co. v. Becker, No.

1:99-CV-384, 2001 WL 1699191, at *4 (W.D. Mich. Oct. 2, 2001) (denying plaintiff's motion for

summary judgment where, viewing the evidence in the light most favorable to the individual

defendants, it was possible that the defendants were actively involved in the company's daily

operations but were not involved in disposal of hazardous waste products); Norfolk Southern Ry.

Co. v. Gee Co., No. 98 C 1619, 2001 WL 710116, at *20 (N.D. Ill. June 25, 2001) (finding that

individual director was not an operator and granting his motion for summary judgment because

the evidence showed that "his role was the standard one for someone in his position: to authorize

any capital expenditure, whether it be related to environmental improvements or not.").

    In the instant case, the City's evidence that Crawford asserted actual control over

decision-making concerning environmental compliance during his ten years as Chairman and

CEO consists essentially of (1) his signature on one solid waste permit application, (2) his

designation as a contact person on that solid waste permit, (3) his signature on a Solid Waste

Management Facility Inspection Report as the "Individual in Responsible Charge," (3) his

participation in an unspecified number of meetings with environmental regulators to discuss an

odor control problem and an oil spill on the property relating to the work of Merco and Safety

Clean, (4) some correspondence between Crawford and the DEC concerning an odor control plan

and some other improvements designed to bring the facility into compliance with environmental

regulations vis-a-vis the operations of Merco and Safety Clean, and (5) the testimony of two

witnesses who said Crawford was present at the First Avenue Yard on a daily basis and generally described him as "the boss" or "number one" at Cross Harbor but did not testify that they ever saw or heard Crawford direct anyone regarding waste disposal.

This evidence raises genuine issues of material fact concerning the depth of Crawford's involvement in environmental compliance and hazardous waste disposal. However, it does not resolve those issues for summary judgment purposes. By itself, this evidence does not demonstrate conclusively that Crawford had the level of involvement required for a finding of operator liability.

As for the timing of the release, there is certainly ample evidence that hazardous waste disposal occurred at the site, but there is very little specific evidence as to when such disposal occurred. The City urges the court to accept the testimony of Aufiero, Massa and Baez as establishing beyond dispute that hazardous substances were released at the First Avenue Yard in the 1990's, arguing that their testimony is corroborated by the findings of the City's investigations in 1997 and 2001. (See Transcript of Oral Argument, dated Nov. 22, 2005, at 48-49.) As explained above, however, this court cannot make credibility determinations on a motion for summary judgment, especially where the witnesses' testimony is disputed or contradicted. For one thing, the depositions took place in 2001 and 2003, years after the City's initial investigation took place and its findings were known. In addition, Aufiero worked at the site long before Crawford joined Cross Harbor and would have had knowledge concerning any activities that took place at the site prior to 1989. Aufiero also stated that he had no direct knowledge of any drums of chemicals being buried at the First Avenue Yard (Aufiero Dep. at 113), and he adamantly denied that any Cross Harbor employee was involved in burying drums of chemicals in

the trench. (Id. at 118, 121.) Although Massa claimed to have seen approximately 50 drums in the trench, Aufiero, who worked at the site on a daily basis, did not fully corroborate that testimony. Aufiero stated only that he saw some drums in the trench, in addition to other debris. (Id. at 293-94). And neither Massa nor Aufiero could say what, if anything, the drums in the trench contained.

Moreover, although both Aufiero and Baez claimed to have seen at least one truck filled with drums arrive at the First Avenue Yard, and both testified that the pettibone emitted a strong odor the next day, neither could say what was in the drums or what was causing the foul odor. Even though the City's investigation uncovered hazardous substances at the site, to conclude that the drums Aufiero and Baez saw contained those same hazardous substances would require the court to draw an inference in the City's favor, which it may not do on a summary judgment motion. To the contrary, this court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party *against* whom summary judgment is sought." Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotations omitted) (emphasis added).

The City also urges the court to find, as a matter of fact, that the door of the box truck bearing HUT number K19382 was buried at the First Avenue Yard during Crawford's tenure as Chairman and CEO. A U.S. Postal Service Incident Report, dated January 23, 1989, indicates that the box truck in question contained third class mail and "was completely destroyed by Fire" on that date while it was awaiting transfer to Cross Harbor for an onward ferry move to New Jersey. (Pl.'s Ex. LL.) Other documentation indicates that the box truck's title was transferred on November 28, 1989, after the box truck was destroyed. (Id.) Crawford was

elected Cross Harbor's Chairman and CEO on January 27, 1989, four days after the fire destroyed

the box truck. (Pl.'s Ex. I.) Thus, in order to make the finding the City seeks, this court would

have to draw an inference that the box truck door was not buried in the intervening four days

between the fire and Crawford's installation as Chairman and CEO. While this may well be a

reasonable inference for a fact-finder to make, it is not appropriate for the court to draw such an

inference on a motion for summary judgment.

      In sum, the City's evidence on the issue of Crawford's operator liability under

CERCLA may well prove persuasive to a fact-finder, but it is not this court's role to find the

facts. Viewing the evidence in the light most favorable to the non-movant, as this court must, I

find that there are material issues of triable fact in dispute.

### The City's Claim Under New York Navigation Law § 181

      New York Navigation Law § 181 states, in relevant part:

> 1. Any person who has discharged petroleum shall be strictly
> liable, without regard to fault, for all cleanup and removal costs and
> all direct and indirect damages, no matter by whom sustained, as
> defined in this section. . . .

Commonly known as the "Oil Spill Act," this statute was enacted "to ensure swift, effective

cleanup of petroleum spills that threaten the environment." State of New York v. Green, 754

N.E.2d 179, 182 (N.Y. 2001). Section 195 of the Navigation Law instructs that the act be

liberally construed to effect its purpose: protecting the general health, safety, and welfare of the

people of New York. N.Y. Nav. L. § 195 (McKinney 1999). Nonetheless, the City concedes that

the Navigation Law "set[s] forth [a] somewhat higher standard of liability than do CERCLA or

the HSERL." (City Mem. at 15.) A finding of liability requires a plaintiff to demonstrate that

"(1) defendant[] [is a] discharger[] under the statute; (2) a discharge occurred; and (3) the

discharge contaminated plaintiff's property – to support a finding that [it is] an injured party."

Lambrinos v. Exxon Mobil Corp., No. 1:00-CV-1734, 2004 WL 2202760, at *7 (N.D.N.Y. Sept. 29, 2004).

Crawford does not appear to dispute the City's allegation that petroleum was discharged at the First Avenue Yard, which the City owns. Petroleum is defined as "oil or petroleum of any kind and in any form including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and kerosene." N.Y. Nav. L. § 172(15). Soil samples taken from the site tested positive for SVOCs, which, according to the City's witness, are commonly associated with petroleum or oil. (Peronto Aff. ¶ 17.) The statute defines "discharge" as "any *intentional or unintentional* action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow. . . ." N.Y. Nav. L. § 172(8) (emphasis added). The term "waters" includes both surface and groundwater. Id. at § 172(18).[13]

To be deemed a discharger under the Navigation Law, however, a defendant must have, by intentional or unintentional act or omission, discharged petroleum. Atlantic Richfield Co. v. Current Controls, Inc., No. 93-CV-0950E(H), 1996 WL 528601, at *8 (W.D.N.Y. Sept. 6, 1996). "The statutory scheme makes clear that liability as a 'discharger' is based upon conduct, not status." Drouin v. Ridge Lumber, Inc., 619 N.Y.S.2d 433, 435 (4th Dep't 1994). See also State of New York v. Markowitz, 710 N.Y.S.2d 407, 412 (3d Dep't 2000) (to be held personally

---

[13] The First Avenue Yard is approximately 200 feet west of the East River. (Peronto Aff. ¶ 5.) There may, however, be yet another issue of fact as to whether the First Avenue Yard can be considered property "from which [the waters of the state] might flow" under N.Y. Nav. L. § 172(8). The City has submitted scant evidence on this issue.

liable for a discharge of petroleum under Navigation Law § 181, an individual defendant must have been "directly, actively, and knowingly involved in the culpable activities or inaction which led to the spill or which allowed the spill to continue unabated."). Hence, for § 181.1 liability to attach, it is not enough to show that an individual defendant possessed or operated the property generally.

The City has provided no direct evidence that Crawford personally caused or contributed to a discharge of petroleum, or that he ordered anyone else to engage in acts that led to a petroleum discharge. Nor has the City provided any evidence as to when a petroleum discharge occurred. The City's evidence that Crawford was a "discharger" for purposes of the Navigation Law consists primarily of (a) the testimony of Massa and Aufiero that Crawford was seen standing in the vicinity of a trench containing drums, and (b) Crawford's own deposition testimony that he had discussions with environmental regulators concerning an oil spill resulting from Safety Clean's operations. (City Mem. at 47.) This evidence does not show the absence of a genuine issue of material fact concerning Crawford's involvement in a petroleum discharge. To the contrary, it does no more than raise such issues. Accordingly, the City's motion for summary judgment on this claim must be denied.

The City's Claim Under Section 24-604 of the New
York City Hazardous Substances Emergency Response Law

New York City Administrative Code § 24-604 states, in pertinent part:

a. Each responsible person shall be jointly and severally liable
without regard to fault, except as otherwise provided in this chapter,
for the total cost incurred by the city for response measures
implemented in connection with any emergency involving a release
or substantial threat of a release of a hazardous substance into the
environment.

The Hazardous Substances Emergency Response Law ("HSERL") defines a "responsible person" as:

> (1) any owner, operator, lessee, occupant or tenant . . . of property at the time there is a release, or a substantial threat of a release, of a hazardous substance from such property into the environment or at the time of any response measures implemented in connection with any emergency involving such release or threat of release . . . ., or
>
> (2) any person whose acts or omissions caused or substantially contributed to a release, or a substantial threat of a release, of a hazardous substance into the environment . . . ., or
>
> (3) any owner, operator, lessee, occupant or tenant of the property at the time of disposal of any hazardous substance thereon, who had caused, authorized or permitted such hazardous substance to be so disposed, where there is a release, or a substantial threat of a release, of such hazardous substance into the environment, or
>
> (4) any person who, pursuant to contractual arrangement, accepts or has accepted any hazardous substance for transport, transports such hazardous substance and there is a release, or a substantial threat of a release, of such hazardous substance into the environment, or
>
> (5) any person who by contract, agreement, or otherwise arranged for disposal or treatment or arranged with a transporter for transport for disposal or treatment of a hazardous substance owned or possessed by such person, and there is a release, or a substantial threat of a release, of such hazardous substance into the environment . . . .

This court's research uncovered no case interpreting the term "responsible person" under the HSERL, and the parties cite none. Nor, as Crawford points out, does the statute contain a definition of the word "emergency," although the "Declaration of Policy" states that the purpose of the HSERL is "to preserve, protect and improve the public health, safety and welfare, and to prevent injury to human, plant and animal life and property." N.Y.C. Admin. Code § 24-602.

The City argues that Crawford is a responsible person under this statute, as one

whose acts or omissions caused or substantially contributed to a release of a hazardous substance, because he "was responsible for directing environmental compliance issues at the First Avenue Yard during the time the illegal disposal activities occurred, he had or should have had actual knowledge of the burial and illegal hazardous waste disposal activities that occurred in 1992 and 1994, and he took no action to abate these illegal disposal activities from occurring." (City Mem. at 49.) However, as explained above, the issues of whether Crawford was "responsible for directing environmental compliance issues at the First Avenue Yard" and when the release or releases occurred present questions of material fact that cannot be resolved on a motion for summary judgment. The same is true with respect to whether the substances found on the property presented enough of a danger to the public health, safety and welfare as to constitute an "emergency." Accordingly, the City's motion for summary judgment on this claim must be denied.

### The City's Claims for Public Nuisance[14]

To establish a defendant's liability for the common law tort of public nuisance, a plaintiff must prove by clear and convincing evidence: (1) the existence of a public nuisance, (2) conduct or omissions by the defendant that create, contribute to, or maintain that public nuisance, and (3) particular harm suffered by the plaintiff different in kind from that suffered by the community at large as a result of the public nuisance. Benderson Dev. Co., Inc. v. Neumade Prods. Corp., No. 98-CV-0241SR, 2005 WL 1397013, at *19 (W.D.N.Y. June 13, 2005); NAACP v. Acusport, 271 F. Supp. 2d 435, 482 (E.D.N.Y. 2003). Crawford does not appear to dispute the

_____

[14] The City has stated that it will no longer pursue its cause of action for private nuisance because it owns the First Avenue Yard. (See City Mem. at 51 n. 23.)

existence of a public nuisance at the First Avenue Yard, and at any rate, it is well established that "the release or threatened release of hazardous waste into the environment infringes upon a public right and [is therefore] a public nuisance as a matter of New York law." New York v. Shore Realty Corp., 759 F.2d 1032, 1051 (2d Cir. 1985). Nor does Crawford deny that the City has incurred response costs in an effort to abate the nuisance. See Westwood Pharm., Inc. v. National Fuel Gas Distrib. Corp., 737 F. Supp. 1272, 1281 (W.D.N.Y. 1990) ("If [plaintiff] can establish . . . that it has incurred response costs . . . , those costs will be sufficient to meet the criterion for bringing a public nuisance claim."). The issue at bar is whether the City can establish, by clear and convincing evidence, that Crawford personally engaged in conduct or omissions that created, contributed to, or maintained that public nuisance. As discussed previously, however, there remain questions of fact as to Crawford's involvement in and knowledge of hazardous waste disposal at the First Avenue Yard. Certainly, other parties, including employees of Merco and Safety Clean, had access to the site. Summary judgment must therefore be denied on this claim.

In addition to a claim for common law public nuisance, the City asserts a claim for statutory public nuisance. Section 17-24 of the New York City Administrative Code states that "the word 'nuisance' shall be held to embrace public nuisance, as known at common law and equity jurisprudence; [and] whatever is dangerous to human life or detrimental to human health." N.Y.C. Admin. Code § 17-24. Since this definition is coextensive with the common law definition of public nuisance, summary judgment must also be denied for this claim.

The City's Claim for Trespass

To prove trespass under New York law, a plaintiff must show that a defendant made an unauthorized entry onto private property that resulted in wrongful use of that property.

Seril v. Bureau of Highway Operations of the Dep't of Transp., 667 N.Y.S.2d 42, 45 (1st Dep't 1997).  See also New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1361 (2d Cir. 1989) ("Under New York law, trespass is the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner.") (citing Ivancic v. Olmstead Oil Co., 488 N.E.2d 72 (N.Y. 1985); Phillips v. Sun Oil Co., 121 N.E.2d 249 (N.Y. 1954)).  An actionable trespass must involve a wrongful or unjustifiable entry upon the land of another.  Malerba v. Warren, 438 N.Y.S.2d 936, 940 (Sup. Ct. Suffolk County 1981).

As the court explained in 55 Motor Ave. Co. v. Liberty Indus. Finishing Corp., 885 F. Supp. 410, 424 (E.D.N.Y. 1994), dismissing a trespass claim on facts similar to the instant case, the invasion of another's property is an essential element of trespass.  A release of hazardous substances by a lessee during a lessee's tenancy does not involve a wrongful intrusion upon the land of another, and therefore does not support a trespass claim by the lessor.  Id.  ("[t]he majority of jurisdictions . . . have rejected these claims for failure to allege the basic element of intrusion upon the land of another. . . .").  See also Lee S. Kreindler, Blanca I. Rodriguez, David Beekman and David C. Cook,14 N. Y. Prac., New York Law of Torts § 2:3 (1995) ("In a case of toxic contamination of real property, the current owner has no claim for trespass against a prior owner or lessee, because the intrusion occurred . . . while the defendant was the lawful occupant. Thus, there is no interference with the property of another.").[15]

_____

[15]  It is true, as the City points out, that there are cases in which a lessee's unauthorized use of leased property has supported a claim for trespass by the property owner.  See, e.g., Vitale v. Fowler Oil Co.,  656 N.Y.S.2d 453, 454 (3d Dep't 1997) (landowner properly alleged a trespass against lessee who refused to remove underground petroleum storage tanks upon request); Scroll Realty Corp. v. Mandell, 92 N.Y.S.2d 813, 814 (Sup. Ct. Kings County 1949) (granting injunction where statutory tenant's lease provided that lessee could not deface or drill
(continued...)

The City argues that Crawford is liable for trespass because he violated the terms of Cross Harbor's Occupancy Permit with the City by "using the property for purposes other than railroad, floatbridge, and intermodal purposes." (City Mem. at 56.). It acknowledges, however, that Crawford was legally on the property. (Id.) In light of the court's holding in 55 Motor Avenue, this claim fails "because an essential element of a claim for trespass has not been alleged," namely the wrongful intrusion upon the land of another. 55 Motor Avenue, 885 F. Supp. 2d at 424. Although Crawford has not moved to dismiss this claim, the court is compelled to dismiss it *sua sponte* for failure to state a cause of action.

### The City's Claim for Waste

New York courts have recognized two general categories of waste. First, New York courts recognize "'a substantive cause of action for waste against one in control of real property who . . . allow[s] the property to deteriorate and decrease in value. . . .'" Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 120 (2d Cir. 1994) (quoting United States v. Miller, 400 F. Supp. 1080, 1084 (S.D.N.Y. 1975)). Second, New York courts recognize a cause of action for waste by a mortgagee against a mortgagor who "impairs the mortgage." Id. (citing Union Mortgage Co. v. Nelson, 82 N.Y.S.2d 268, 269 (Sup. Ct. Bronx County 1948), aff'd, 91 N.Y.S.2d 839 (1st Dep't 1949); Syracuse Sav. Bank v. Onondaga Silk Co., Inc., 14 N.Y.S.2d 356, 357-59

---

[15](...continued)
into building without written permission of the lessor, landlord's oral permission for tenant to install television aerial was merely a license revocable at will and continued maintenance and use of aerial after demand to remove constituted a trespass). These are essentially cases seeking injunctions for violating the terms of a lease, and none appear to deal with contamination or a release of hazardous substances on the property. Regardless, the New York Court of Appeals has not spoken on this issue, and Judge Amon found in 55 Motor Avenue that, were it to do so, it would likely reject a lessor's trespass claim against a lessee for hazardous waste disposal on the leased property. See 55 Motor Avenue, 885 F. Supp. 2d at 424.

(Sup. Ct. Onondaga County 1939); <u>Van Pelt v. McGraw</u>, 4 N.Y. 110 (N.Y. 1850)).  This case concerns the first category.

    "'The impingement upon the reversionary estate of the landlord is the keynote to the definition of waste.'"  <u>Garland v. Titan West Assocs.</u>, 543 N.Y.S.2d 56, 60 (1st Dep't 1989) (quoting <u>Rumiche Corp. v. Eisenreich</u>, 352 N.E.2d 125 (N.Y. 1974)).  In other words, a tenant is liable for waste when he or she makes material changes or alterations that injure the property's value or substantially change the "nature and character of the demised premises."  <u>See</u> <u>id.</u>; <u>see also</u> <u>Harar Realty Corp. v. Michlin & Hill, Inc.</u>, 86 A.D.2d 182, 185, 449 N.Y.S.2d 213 (1st Dep't 1982) ("Any alteration which materially injures the landlord's reversionary interest, or materially changes the nature and character of the demised premises constitutes waste.").

    The City alleges that Crawford committed waste by "allowing the burial of chemicals, railroad ties, and other debris at the First Avenue Yard."  (City Mem. at 57.)  However, the nature and extent of Crawford's involvement in or knowledge of any waste burial, as well as the effect on the value of the property, present material issues of triable fact.  Accordingly, summary judgment is denied on this claim.

    <u>The City's Claim for Tortious Interference</u>

    Finally, the City asserts a claim against Crawford for inducing a breach of Cross Harbor's lease with the City.  As Judge Trager recently explained in <u>Craig v. First Web Bill, Inc.</u>, "'[t]he existence of a plausible claim for breach of contract does not, without more, provide a basis for the assertion of a cause of action for interference with the contractual relations against those corporate officers and directors whose actions brought about the asserted breach.'"  No. 04-CV-1012, 2004 WL 2700128, at *9 (E.D.N.Y. Nov. 29, 2004) (quoting <u>Joan Hansen & Co. v.</u>

Everlast World's Boxing Headquarters Corp., 744 N.Y.S.2d 384, 389-90 (1st Dep't 2002)).

Generally, "'[a] corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer . . . [and did not commit] independent torts or predatory acts directed at another.'" Id. (quoting Murtha v. Yonkers Child Care Ass'n, 383 N.E.2d 865, 866 (N.Y. 1978); see also Mobile Data Shred, Inc. v. United Bank of Switzerland, No. 99 Civ. 10315, 2000 WL 351516, at *7 n. 9 (S.D.N.Y. April 5, 2000) ("officers, directors or employees of a corporation are not personally liable . . . if they act on behalf of the corporation and within the scope of their duties.") (citations omitted). Personal liability can be imposed only if it is shown that the defendant acted outside the scope of his employment, by committing an independent tort, or by pursuing a personal, and not corporate, interest. Mobile Data Shred, Inc., 2002 WL 351516, at *7 n. 9. Thus, "even if it is shown that the defendant failed to act in good faith, liability will not be imposed absent a showing of an independent tort, or that the actions were designed to serve a personal interest." Craig, 2004 WL 2700128, at *9 (citing Foster v. Churchhill, 665 N.E.2d 153, 157 (N.Y. 1996)).

The City argues that Crawford is liable for inducing a breach of Cross Harbor's lease because he "allowed the intentional burial of chemicals, rail ties, and other waste at the First Avenue Yard" and committed the independent tortious acts of public nuisance, trespass, and waste. (City Mem. at 59.) As explained above, the complaint does not state a claim for trespass, and material issues of triable fact exist as to Crawford's involvement in or knowledge of the burial of waste at the First Avenue Yard. Accordingly, summary judgment must also be denied on this claim.

**CONCLUSION**

For the foregoing reasons, the City's state law claim for trespass is dismissed for

failure to state a cause of action.  The City's motion for partial summary judgment is denied with

respect to the remaining claims.

SO ORDERED.

Dated: Brooklyn, New York
          January 17, 2006


                                                    _____/s/_____
                                                    ROBERT M. LEVY
                                                    United States Magistrate Judge